Howard A. Jones, J.
Defendant, having been convicted of attempted murder of a peace officer and other crimes, moves prior sentence for an order declaring invalid the provisions of subdivision 1 of section 110.05 of the Penal Law as it existed in May, 1973, categorizing the crime of attempted murder of a peace officer as a class A felony. The attack upon the statute is two-pronged: (a) the language of the section, as it then existed, contravened the historic policy and continuing intent of the Legislature to punish any inchoate crime less .seriously than the completed crime to which it relates; and (b) the statutory provision is .unconstitutionally violative of substantive due process as far as the facts of this case are concerned. The thrust of this attack, if sustained, is that the penalty for the attempted murder of a police officer ought to be treated as a class B felony as it would be if the intended victim were anyone other than a police officer.
FACTUAL BACKGROUND
Defendant was convicted after trial on several counts of a consolidated indictment. He was acquitted on several other counts. The convictions included, among others, a count of attempted murder of a police .officer. Defendant and others were involved in a shoot-out with police at a Westchester railroad station in May, 1973. Defendant was tried separately on these charges, severances having been granted to all defendants for a variety of reasons. The other defendants are yet to be tried.
HISTORY OR THE STATUTE
For many years in New York, prior to the effective date of the revised Penal Law of 1967, an attempt to commit a crime was punishable by imprisonment for one half the maximum term prescribed for the corresponding completed crime. In the case of ia capital or life-term crime, the maximum penalty for the attempt was up to 25 years’ imprisonment (Penal Law of 1909, § 261 derived from Penal 'Code of 1881, § 686, as amd. by L. 1902, ch. 116, § 1).
*355 Indeed, as originally enacted, the revised Penal Law of 1967 (L. 1965, ch. 1030, as amd. ¡by L. 1967, ch. 791) continued this distinction ¡between inchoate and completed crimes and between the punishments therefor. It classified all attempts at ;one grade below that of the completed crime. Thus, under this scheme and as relevant to the issues here, murder (with the previous degrees thereof abolished) was designated a 'class A felony (Penal Law, § 125.25) punishable, along with all other A felonies, Iby life imprisonment (Penal Law, § 70.00). However, in the case of murder only, certain exceptions were enacted including that of the murder ¡of a peace officer perf orming his duty. Under very particular circumstances, this crime, while still a class A felony, could be punished iby imposition of the death penalty. While not mandatory, such penalty was available (Penal Law, § 125.30). Attempted murder (of anyone), now designated a class B felony (Penal Law, § 110.05) ¡was punishable iby up to 25 years’ imprisonment pPenal Law, ■§ 70.00). Thus, it can ibe seen that a very clear distinction was initially maintained by the Legislature between attempted and completed crimes and the punishments for each.
In 1970, however, section 110.05 was amended by the Legislature to the extent that the attempted murder ¡of a peace officer performing ¡his duty was upgraded to a class A felony, the same classification as that of the completed murder (L. 1970, ch. 112). As such, it could now be punished by life imprisonment under .section 70.00 ¡rather than a ,25-year term as for class B felonies. Of course, the discretionary capital penalty remained available only for the completed crime. Hence, the penalties between the inchoate and completed crime, while somewhat equated, ¡were not exactly alike in the case of peace officers. It must be noted, however, that from this point on the penalty for attempted murder of a peace officer was the same as that for the completed murder of an “ average citizen ” (by one other than a lifer).
In 1972, the Legislature, in an apparent effort to more clearly demonstrate its intent to provide for this desired upgrading, amended subdivision ¡2 of section 110.05 as indicated below. The pertinent portions ¡of that section then read:
“ An attempt to commit a crime is a:
“ 1. ¡Class A felony when the crime attempted is murder of a peace officer in the course of performing his official duties;
‘ ‘ 2. Class B felony when the crime attempted is a class A felony except as provided in subdivision one hereof; ” (L. 1972, ch. 292, eff. Sept. 1, 1972, amdg. subd. 2; emphasis added).
*356 The possible penalties for ¡the attempted murder 'of a peace officer (life) and the completed murder of a peace officer (life or death) continued until aboutthree ¡weeks after the commission of the instant crime of attempted murder of a peace officer for which the defendant now stands convicted. On June 7,4973, the Hew ‘York ¡State Oourt . of Appeals in People v. Fitzpatrick (32 N Y 2d 499) unanimously struck down as u cruel and unusual ” the discretionary, capital punishment provisions of sections 125.30 and 125.35 of the Penal Law under the authority . of the United ¡States ¡Supreme ¡Court’s holding in the case of Furman v. Georgia (408 U. S. 238). So ¡from at least that June date (until Sept. 1, 1974) the possible penalties for the attempted and completed murder of a peace officer ¡were exactly alike; i.e., life imprisonment.
QUESTIONS PRESENTED AND DISCUSSION
Stated in its most presuasive form, defendant’s first argument would seem to proceed along, the following, somewhat logical, lines:
Historically, the Legislature in Hew York has always treated the crime of attempt to commit a felony less ¡seriously than -the completed felony itself . . . (at this .point in the'argument, it would have been better- to acknowledge existing exceptions to this general ml» of law rather than to overstate the alleged uniqueness of the penalty for attempted murder of a policeman).
There is nothing to suggest ¡that by the 1970 amendment the Legislature intended simply to add yet another exception to this recognized rule. On the contrary, there is every indication that precisely the opposite was intended — i.e., to provide, consistent with the existing rationale, a penalty less severe (life imprison-. ment) for ¡the attempt than for the completed crime of murder of a policeman (death penalty).
Inasmuch as this clear legislative intent to distinguish between the two crimes, penalty1 wise, was thwarted only as a result of court decisions relating to defects in the form of the legislation provided, that intent can be implemented and that purpose served only by striking down the life sentence provisions of the law in question and treating this class A felony conviction as if it had been one for a class ¡B felony — i.e., a maximum of 25 years:
The logic of defendant’s position, of course, as well as thé validity of any conclusions derived therefrom,- depends on the soundness of each of the premises upon which the whole argument in constructed.
*357 Upon careful examination and analysis of the defendant’s first argument, the court finds .Several ¡weaknesses in its underlying structure. More importantly, even if the underlying premises, though weak, can be said to be valid, it is doubtful whether the suggested conclusion is the only ¡one that can or should be drawn, under ¡all the circumstances. .Stated differently, the court must consider whether the recommended medicine may not be more .poisonous to the system than ithe illness for which it is being prescribed.
While it is true that historically the Legislature in this State has generally preferred to ¡provide a pattern of lesser penalties for inchoate crimes, such a rule has been far from inviolate and adherence to it far from consistent.
The Model Penal Code, proposed by the venerable American Law Institute in 1959, is replete with instances in which the attempt to commit a felony is treated with the same severity as the completed crime. Indeed, it is obvious that much of this philosophy of punishment as well as several instances of similar anomalies in the law had already found their way into New York’s Penal Law .long before the decision of the Court of Appeals in Fitzpatrick (32 N Y 2d 499, supra). For example:
—with respect to ¡the various crimes of bribery, the attempt is considered tantamount to the crime itself and has been for some time;
—with respect to murder by a defendant under the age of 18, a completed murder is no more serious than an attempt by an adult;
—with respect to the completed murder of a .policeman by an adult (including May, 1973), the death penalty was not mandatory, hence such crime could upon jury determination or lack ¡of it, be treated the same as an attempt.
— and .most ¡tellingly, with respect ¡to subsequent legislative amendments to section 110.05 of the Penal Law within the last two years or so, it must be noted in more than passing fashion that .as the section now exists, 13 attempted crimes have been added and equated both in classification and in penalty with their completed counterparts and all are in varying degrees, class A felonies. Indeed, there are nnly two A felonies left, specifically arson in the first degree ¡and kidnapping in the first degree, the attempts at which remain treated as class B felonies. Clearly, this -speaks of a new direction in the Legislature’s view of punishment for attempted crimes.
It can be seen from the foregoing brief analysis of legislative performance in this ¡area, to date, that where it has been so *358 inclined in some instances, the Legislature has specifically decreed that attempted crimes ibe punished to the same extent as completed ones. In .other instances, they ¡have clearly done just the reverse. In still others, ¡their concern in this area has been not so clearly expressed. The present case, at best, seems to fall in this latter category.
It cannot be seriously urged that the legislative history of section 110.05 of the Penal Law reveals .a primary concern on the part of the Legislature to establish ,any firm or fixed policy with respect to penalties for attempted felonies. Bather, over the years, some blueprints and guidelines have been provided in this area, the parameters of which have varied and fluctuated depending, at different times, on the nature of the crime, the class of criminal, the public policy to be served, or other circumstances that were frequently sought to be ¡addressed.
The 1967 revision of ¡the Penal Law provided the first truly definitive approach to the problem of the appropriate penalty structure for attempted crimes but even then, significantly, some of the many paradoxes already referred to were allowed to remain in the law. While specifically rejecting the formulation proposed by the 1969 Model Penal .Code, the Legislature, adopting the recommendations of the Penal Law Bevision (Bartlett) Commission decided to treat the attempted murder of a policeman as a class B felony. At the time of this enactment, the murder of a policeman was declared to be a capital offense, but not in all cases. And it was precisely for this reason that this death penalty provision was .later struck do.wn by the courts as unconstitutional. Thus, the enactment in 1970 of a provision raising the classification of attempted murder of a policeman from a class ¡B to a class A felony must be viewed .and interpreted for precisely what it was — a clear expression of intent on the part of the Legislature to increase the penalty for this inchoate crime, not to reduce it. If in the process ¡of doing so the Legislature disturbed any existing “ balance ” between the penalties for completed crimes vis-a-vis attempts, this court can only conclude that it intended to do so . . . and by so doing, it must be conceded that the Legislature created a condition no worse than already existed in the law with respect to certain ¡other crimes and certain other situations involving murder, already referred to.
By ¡approaching the question in this manner, the obvious legislative intent is hereby preserved and the presumption of legislative regularity upheld. To hold otherwise would be tantamount to unnecessary judicial encroachment and would certainly thwart *359 what appears to have been the primary legislative intent herein.
Although the court may 'differ philosophically with the Legislature ’s determination that the attempted murder of a policeman, even in the 'absence of any physical injury, is just as serious as the completed, cold-blooded murder of a Judge, for revenge, or the mercenary killing of a legislator by a hired thug, the court may not substitute its own judgment in the matter for that of the Legislature — no matter how great or how justifiable the temptation may be to do so. One can only hope that in time the Legislature itself may see fit to restore a little more rationality to this area of the law.
The second argument raised by the defendant relates to the constitutional question of the inherent power of the Legislature to enact laws relating to the maintenance of public peace and safety, preserving law ,and order, and regulating its own police powers. It has been established and goes without question at this point in our history that this is one of the most fundamental and at the same time one of the broadest powers of the State, the exercise of ¡which is limited only by the requirement that there be a reasonable relationship ¡between .such exercise and the public good .sought to be obtained thereby, and that there be ,a showing that such power was not exercised arbitrarily. As indicated above, this the defendant has failed to do.
That special groups are preferentially treated under the Penal Law is nothing new. One has only to examine long-standing provisions of the rape and sodomy sections, article 260 relating to children ¡and section 120.05 relating to assaults upon peace officers, .Drug Abuse ¡Control Commission (DAOC) employees and firemen, to find other instances where various groups have been selected for special protection because of tender years or hazardous duty. Defendant has failed to show that no rational factual basis exists for such selectivity or that such special treatment is so arbitrary as to violate proper exercise of the State’s police power. It is interesting to note in this connection that the ¡Court ¡of Appeals in Fitzpatrick (32 N Y 2d 499, supra), in striking down the discretionary death penalty statute, did so on the basis of the cruel and unusual punishment provisions of the Eighth Amendment. It did not do so on the ground that only a special group was afforded such protection. Indeed, the court said, “ The circumstance that the penalty is limited to those found guilty of killing police and other police officers is irrelevant; it does not alter or affect the fact that the Legislature, instead of providing mandatory death sentences for all defendants who kill police officers, has vested juries with a dis *360 cretion .to decide, case toy case, .whether that ultimate punishment should foe .inflicted.” (p. 513). Parallel protections can also toe found within the Federal criminal law structure.
Moreover, it is .also well established that a strong presumption of constitutionality attaches to every .legislative enactment, and each enactment must be presumed to have been supported by facts that .were then known to the Legislature (Loblaw v. New York State Bd. of Pharmacy, 12 A D 2d 180). This presumption is, of course, rebuttable but anyone seeking to make such rebuttal has some burden of .showing that there is no permissible interpretation of the statute in question or of the facts of the particular case that would justify the application of the penalty under attack or the exercise of the power from which it flows. (Loblaw, supra.)
The court is not persuaded that this burden has been met either in the written papers before me or in the arguments advanced.
Clearly, there has been no showing of any violation of procedural due process. Indeed, no such claim is even advanced, at least not in those explicit terms, hence, no Fifth Amendment question has been presented. The court has, nevertheless, considered such claim and finds n'o basis upon which it could possibly be sustained, as indicated at some length, above.
The Eighth Amendment challenge, though raised, must similarly toe rejected, as previously indicated.
The challenged section of the Penal Law effective in 1973 (§ 110.05, subd. .1) has a rational basis in fact, and is toy no means arbitrary (Reed v. Reed, 404 U. iS. 71). Furthermore, the defendant has failed to adequately raise any Eighth Amendment challenge; he has not even attempted to show that the penalty in question is so severe as to degrade human dignity (Furman v. Georgia, 408 U. S. 238, 271, supra; Weems v. United States, 217 U. S. 349, 366). It .is noted here that the sentence of life imprisonment has been held not to toe inherently cruel or unusual (People v. Kaganovitch, 1 A D 2d 680; United States ex rel. Bongiorno v. Ragen, 146 F. 2d 349, cert. den. 325 U. S. 865).
¡The court has also considered, sua sponte, the question whether any Fourteenth Amendment rights have been violated here, including either matters of substantive due process or equal protection clause considerations. Again, no basis for challenge along these lines has been suggested nor can any toe identified, in the court’s opinion.
The only other conceivable area of challenge would be the privileges and immunities section .of the Constitution. The court *361 would, indeed, have to engage in the most torturous reasoning and stretching of its legal imagination to come ¡up ¡with a valid basis for such challenge here. Again, the question was considered along these lines, but must also be rejected.
The motion is, therefore, denied in all respects and the court will proceed to impose sentence pursuant to the provisions of section 70.00 (subd. 2, par. [a]) of the Penal Law.